UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: SPARRER SAUSAGE COMPANY INC. | ) ) ) | Bankruptcy Case No. 12 B 04289 |
| DEBTOR. | ) ) ) ) ) | Chapter 11 |
| THE UNSECURED CREDITORS COMMITTEE OF SPARRER SAUSAGE COMPANY, INC., | ) ) ) ) ) | Adversary Case No. 13 AP 01195 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| JASON'S FOOD, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding between the Unsecured Creditors Committee of Sparrer Sausage Co. and Jason's Foods raises a claim of preferential payments and is before the court for entry of judgment. The parties submitted stipulated facts, which included a stipulation that the payments in question were preferences in the absence of applicable affirmative defenses. *See* Joint Statement of Stipulated Facts, p. 2 ¶ 6 (Docket No. 25). The only issue to be determined is the applicability of the two defenses raised by Jason's. As set forth below, the defenses are effective as to a portion of the payments in issue.

*Jurisdiction*

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. The district courts may refer these cases to the bankruptcy judges for their districts under 28 U.S.C. § 157(a), and the District Court for the Northern District of Illinois has made such a reference through its Internal Operating Procedure 15(a). Under 28 U.S.C. 157(b)(1), a bankruptcy court may hear and determine core proceedings arising under title 11.

Allowance or disallowance of a claim is a core proceeding. 11 U.S.C. 157(b)(2)(B); *see Stern v. Marshall*, 131 S.Ct. 2594, 2619 (2011). Under 11 U.S.C. § 502(d), a court is required to disallow any claim of an entity from which property is recoverable under 11 U.S.C. § 547. Therefore, if a defendant in a preference action under § 547 has filed a claim, the preference

1

action is considered a defense to the claim. *See In re Olde Prairie Block Owner, LLC)*, 457 B.R. 692, 698–99 (Bankr. N.D. Ill. 2011). Since a defense to a claim would necessarily be part of claim adjudication, the preference action is core and bankruptcy courts may finally adjudicate such matters. *Stern*, 131 S.Ct. at 2616; *Olde Prairie*, 457 B.R. at 699.

In this case, the defendant, Jason's Foods, filed a claim on March 6, 2012, through its agent, Euler Hermes, making this action a core proceeding under 11 U.S.C. 157(b)(2)(B).

*Ordinary Course of Business Defense Under § 547(c)(2)(A)*

Jason's first defense is that the payments made during the preference period were made in the ordinary course of business under 11 U.S.C. 547(c)(2)(A). If so, the transfers would not be preferential and would not be avoidable. Jason's Foods must show that the transfers were made in the ordinary course of business by a preponderance of the evidence. *See* 11 U.S.C. § 547(g).

In order to determine what is ordinary, the first step is to establish a historic baseline period as a point of comparison. *See Matter of Tolona Pizza Products*, 3 F.3d 1029, 1033 (7th Cir. 1993). In *Tolona*, the Seventh Circuit advises courts to examine a period of time "well before" the preference period—and before the debtor began experiencing financial difficulties—to determine what the ordinary practices were between the debtor and the creditor. *Id.*

Once a baseline is established, the next step is to compare the average time it took the debtor to pay an invoice during the baseline period to the time it took to pay invoices in the preference period. *See Eugene I. Davis v. R.A. Brooks Trucking, Co., Inc. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 386 (Bankr. S.D.N.Y. 2013). "Generally, this involves a comparison of the average number of days between the invoice and payment dates during the pre-preference and preference periods." *Id.*

In order to do this, the *Quebecor* court used a weighted average of the payments made during the baseline period, an analysis that takes into account the "relative invoice amount" when determining the average. *Id.* at 387 n.3. The weighted average is calculated by "multiplying the amount of the invoice by the days it took to make payment then dividing that value by the total amount of the invoices in the data set." *Id.*

The *Quebecor* court then examined the transfers in the baseline period, grouping payments into "buckets" based on how far they deviated from the average. *Id.* at 388. The court found that payments made forty-five days after the invoice date were not ordinary and avoidable. *Id.*

Similarly, the court in *Halter v. Aircomfort* used the weighted average of the baseline payments to analyze payments during the preference period. *Friede Goldman Halter v. Aircomfort, Inc. (In re Consolidated FGH Liquidating Trust)*, 392 B.R. 648, 661 (Bankr. S.D. Miss. 2008) (finding that many payments in the preference period were paid in half the time usually taken in the baseline period). The court looked at the pattern of historical payments and found that payments outside a range of 30 to 45 days were avoidable. *Id.*

In this case, the appropriate historical baseline is the period before, but including, April 15, 2011. This is "well before" the preference period, which began November 9, 2011 and excludes payments that appear to mark the beginning of the debtor's financial difficulties. *See Tolona Pizza*, 3 F.3d at 1033. *Compare* Exhibit 5, p. 5 (where the oldest payments in the proposed baseline two were made 38 days after invoice) *with* Exhibit 5, p. 6 (where a series of payments more than 40 days old, some over 45 days old, begin to appear after April 15, 2011).

The Committee argued that payments from Sparrer in response to single invoices should be excluded from the baseline. Amended Brief for Committee at 8 n.1. However, this type of payment is not so uncommon to justify its exclusion from the historic period chosen by the court.

Within the baseline historical period, the weighted average time of invoice to payment by Sparrer is 21.99 days with payments generally made between 16 and 28 days after the invoice date. *Cf. Quebecor*, 491 B.R. at 386. This 16 to 28 day period, then, was the ordinary course of business for Sparrer's payment of invoices.

Jason's Foods has argued that courts have allowed significant deviations from the historic average, noting that "perfect conformance" with historical ranges is usually not required. Reply Brief for Defendant at 4 (citing *H.L. Hansen Lumber Co. of Galesburg, Inc. v. G&H Custom Craft, Inc (In re H.L Hansen Lumber Co. of Galesburg, Inc.)*, 270 B.R. 273, 270 (Bankr. C.D. Ill. 2001). However, the burden to prove the payments as ordinary is on Jason's. In its brief, Jason's admits that in the eight months before the petition date, payments from the debtor became later and later. Def. Br. 6. Jason's has not shown why these payments—which it admits are paid later than during the time well before the bankruptcy—are ordinary. Jason's has not established an ordinary course greater than the 16 to 28 day period after the invoice date.

The parties' stipulation shows eleven payments outside this range, totaling $306,110.23. Those eleven payments are not subject to the ordinary course defense.

*New Value Defense Under 11 U.S.C. 547(c)(4)*

The remaining defense is set out in § 547(c)(4) of the Code, which allows a defendant to offset preference payment liability with new value given to the debtor. In order for this defense to apply, a creditor who has received a preference must make two showings: first, that the creditor advanced additional value to the debtor after receiving the preference; and second, that the creditor did not receive payment of that additional value. *See Estate of GGSI Liquidation, Inc. v. Quad-Tech, Inc. (In re GGSI Liquidation, Inc.)*, 313 B.R. 770, 776 (Bankr. N.D. Ill. 2004) (citing *Matter of Prescott*, 805 F.2d 719, 731 (7th Cir. 1986)).

Here, there is no question that Jason's Foods supplied additional value—in the form of food products—to Sparrer Sausage after it received some of the eleven preferential payments discussed above. The issue is whether the new value deliveries remained unpaid. Although Sparrer failed to pay for these deliveries, Jason's was reimbursed for the deliveries through insurance, and Jason's has filed a claim against the estate in the amount of the invoices through

its insurer. The question is whether reimbursement by a third party prevents a creditor from using the new value defense.

The policy behind the new value defense is that, by advancing new value to the debtor, the creditor has paid the preferential payment back to the estate. *See Matter of Prescott*, 805 F.2d 719, 731 (7th Cir. 1986). By giving new value that the estate has not paid for, the creditor puts the debtor's estate in the same position that it occupied before it made the preferential payment—with the debtor owing the same amount to the creditor for unpaid goods that it owed before making the preferential payment. *Id*. But if the debtor pays for the new value, the new defense is inapplicable, since the new value would not offset the preference.

When third parties provide payment to creditors who have supplied new value, the question is whether that payment, like payment from the debtor itself, negates the effect of the new value. *See Matter of Kroh Bros. Development Co.*, 930 F.2d 648 (8th Cir. 1991) ("[O]nly the effect on the estate, not the source of payment, is relevant.").

For example, in *GGSI Liquidation, Inc.*, the court found that third party payments prevented use of the new value defense because the third party payments, like payment from the debtor itself, depleted the estate. 313 B.R. at 772. In *GGSI*, the debtor was a manufacturer. The debtor made preferential payments to one of its subcontractors. The subcontractor asserted a new value defense, and the court found that the subcontractor had indeed provided new value to the debtor. However, a third party—the debtor's customer—paid the subcontractor directly for the new value provided by the subcontractor. And because the customer reduced the amount it paid the debtor by the these payments to the subcontractor, the customer's payments to the subcontractor depleted the debtor's estate to the same extent as it would have been depleted if the debtor had paid the subcontractor directly. Therefore, the new value did not offset the preference, and the court found that the subcontractor was not entitled to the new value defense. *Id*. at 779.

In this case, Jason's new value was paid by its insurer. However, unlike the situation in GGSI, the insurance payment did not diminish the Sparrer's estate. The insurer owed Sparrer nothing that would be diminished because of its payment to Jason's. The claim filed by Jason's is no different than the claim it would have been entitled to file had there been no insurance policy. Looking to the effect on the estate, the new value contributed by Jason's was indeed unpaid. Since the net effect of the new value payments was restoration of the estate, Jason's is entitled to a new value defense of $63,514.91, reflecting shipments made between January 18, 2012 and February 6, 2012.

Applying this defense to the amount of the payments made by Sparrer outside of the ordinary course, the final preference liability of Jason's Foods is $242,595.32.

Dated: August 27, 2014

Eugene R. Wedoff
United States Bankruptcy Judge

4